UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

RAILYARD COMPANY, LLC,  No. 15-12386 t11

    Debtor.

CRAIG H. DILL,

    Plaintiff,

v.  Adv. No. 17-1014 t

SOUTHWEST STRUCTURAL SERVICES, INC.
and FLYING STAR CAFES, INC.,

    Defendants.

## OPINION

Before the Court is plaintiff's motion for partial summary judgment. After reviewing the motion, response, and reply, hearing arguments of counsel, and reviewing the applicable law, the Court rules that the motion will be denied, but that the Court will enter an order, pursuant to Fed. R. Bankr. Pro. 7056 and Fed. R. Civ. Pro. 56(g), making certain findings of fact that shall be treated as established in this proceeding. The Court also will rule on one legal issue of importance to the proceeding.

## I. UNDISPUTED MATERIAL FACTS

For the purpose of ruling on the motion,[1] the Court finds that the following facts are not in material dispute:[2]

Debtor is the owner of a leasehold interest in real property commonly known as 500 Market Street, Santa Fe, New Mexico. On or about August 7, 2008, Debtor and Flying Star Cafes, Inc. entered into a lease for 5,505 square feet of the property. Under the lease, Debtor was required to provide Flying Star with specified leasehold improvements, the cost of which would be reimbursed by Flying Star as additional rent.

To make the required improvements, on or about November 30, 2008, Debtor entered into an Addendum to Construction Agreement (the "ACA") with Defendant.[3] Under the ACA, Defendant agreed to complete certain specified construction work in exchange for payments totaling $1,321,200.[4] Documentation of the project is nearly nonexistent. Among the missing documents are:

- Exhibits 1 and 2 to the ACA (apparently the construction drawings and specifications);
- Any subcontracts;

---

[1] The facts deemed established for this proceeding, pursuant to Fed. R. Civ. P. 56(g), are limited to those in the order that accompanies this opinion. The remaining findings are set out to help explain the Court's decision.

[2] In making these findings, the Court takes judicial notice of the dockets in the Debtor's main case, this adversary proceeding, and the docket in the Flying Star Cafes, Inc. bankruptcy case, No. 15-10182. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (citing Fed. R. Evid. 201 and concluding that "[t]he bankruptcy court appropriately took judicial notice of its own docket").

[3] Defendant refers to Southwest Structural Services, Inc. The other defendant, Flying Star, has settled with Plaintiff and will be dismissed.

[4] The ACA says that Defendant would be paid $240 per square foot of the leased premises. The lease states that the premises contain 5,505 square feet. $240 multiplied by 5,505 equals $1,321,200.

- Any records of draw requests, progress payments, or bills or statements sent by Defendant to Debtor;
- Architect inspection report or progress reports;
- Communication among Debtor, Defendant, and/or Flying Star about the construction; or
- Any accounting records of Debtor or Defendant relating to the project.

Defendant completed its work on or about April 23, 2009. Debtor did not pay Defendant as agreed. Apparently, Debtor assumed it would be able to borrow the money from its lender, Market Station Railway Properties, LLC ("MSRP"), but was unable to do so.

Because of the nonpayment, Defendant did not have enough money to pay all of its subcontractors and suppliers. In particular, Defendant could not pay about $478,000 to Plumbtech Plumbing & Mechanical, Inc. ("Plumbtech"), or $320,000 to Builder's Electric Inc.[5]

On or about October 28, 2009, Flying Star sent a letter to Debtor, stating that Flying Star had received unpaid invoices from subcontractors totaling $216,991.99. Flying Star paid this amount, and then deducted $216,000 from the rent it owed Debtor under the Lease.

On December 18, 2009, Plumbtech filed a claim of lien on Debtor's property. The claimed amount was $478,060.17, plus interest at 15% and attorney fees. Plumbtech sued Debtor and the City of Santa Fe on December 16, 2011, to collect the amounts due and foreclose its lien.

On or about April 7, 2012, Flying Star and Debtor signed an Addendum to Retail Lease, resolving disputes between the parties. Among other matters, Flying Star agreed to pay Debtor $1,300,000 for the leasehold improvements. This obligation was to be evidenced by a promissory note (the "Note"), which required interest-only payments for the first five years, and thereafter

---

[5] Steve Duran is the sole owner of Defendant and owns 35% of the Debtor. David Duran is the owner of Builders Electric and owns 17% interest of the Debtor. Bruce Duran owns Plumbtech. Steve Duran, Dave Duran, and Bruce Duran are brothers. Defendant is an insider of the Debtor.

amortized the balance over 12 years at 5% interest. Flying Star signed and delivered the Note to Debtor, effective April 7, 2012.

On April 30, 2012, Debtor assigned the Note to Defendant. The Court has no evidence how the parties accounted for the Note transfer.

Debtor settled with Plumbtech on May 17, 2012. The parties signed a detailed settlement agreement. Under the agreement, Debtor agreed to pay Plumbtech $490,000 over time, while Plumbtech agreed to release its mechanic's lien. The agreement provides:

> [Debtor] received a Promissory Note from Flying Star Cafes, Inc. ("Star") attached hereto as Exhibit A, and the Promissory Note ("Note") was then assigned to Southwest to pay for improvements to the Flying Star Café leased space. [Debtor's] intent is that Southwest will use the proceeds from the repayment of the foregoing Note to satisfy in part [Debtor's] obligation to Plumbtech, and Southwest agrees to pay to Plumbtech from any payment received a pro-rated amount of the Note payments.

Defendant did not sign the settlement agreement, and there is no evidence Defendant ever paid anything to Plumbtech for the Flying Star work, from the Note payments or otherwise.

Flying Star made the interest payments as required until it filed a chapter 11 bankruptcy case in this Court on January 30, 2015. The interest-only payments totaled about $141,000. On Flying Star's petition date, the unpaid principal balance of the Note was $1,300,000.

Debtor filed this case on September 4, 2015. Defendant did not file a proof of claim. Debtor listed Defendant as a creditor, holding a $1 disputed, general unsecured claim. Debtor also listed Plumbtech ($308,615.07) and Builders Electric ($281,193) as general unsecured creditors.

At the time Debtor transferred the Note to Defendant, Debtor had not paid Defendant anything under the ACA, and had been in material default for about three years. Furthermore, Debtor had been in material default to MSRP for about three years. The MSRP debt was more than $17,000,000, and had matured in 2009.

On May 15, 2012, \ Debtor and MSRP entered into a Forbearance Agreement. Among other terms, Debtor agreed to pay Plumbtech $60,000 and one of its suppliers $51,384.93.

Debtor and Defendant both filed proofs of claim in the Flying Star bankruptcy case, and both claimed the amounts due under the Note. Flying Star objected to both claims.

On December 20, 2016, the Court confirmed a plan of reorganization in the Flying Star case. The disclosure statement accompanying the plan estimated a dividend to unsecured creditors of about 66%, over time.

On June 9, 2017, Flying Star and Plaintiff filed a motion to approve settlement in the Flying Star bankruptcy case. Attached to the motion was a proposed settlement agreement, under which Flying Star agreed that either Plaintiff or Defendant would have an allowed claim of $1,300,000 in the Flying Star case, depending on who prevailed in this adversary proceeding. Flying Star further agreed to deposit payments that were due on account of the claim into the Court registry, pending resolution. The Court approved the settlement on June 29, 2017.

On October 4, 2017, the Court entered an order in this adversary proceeding allowing Flying Star to deposit $683,693.36 in the Court registry. This amount is equal to the payments to date from Flying Star on account of the $1,300,000 allowed claim. Unless Flying Star defaults, there will be additional distributions.

II. DISCUSSION

A. Summary Judgment Standards.

The proper use of summary judgment streamlines litigation and avoids the unnecessary expense of proceeding to trial. *See Farnell v. Albuquerque Publ'g Co.,* 589 F.2d 497, 502 (10th Cir. 1978) ("[S]ummary judgment is a useful tool which may avoid needless trials.") (citation omitted); *Mitchell v. Zia Park, LLC,* 842 F. Supp. 2d 1316, 1321 (D.N.M. 2012) ("Principal

purposes of summary judgment include streamlining litigation and saving needless time and expense by isolating and disposing of purely legal issues and factually unsupported claims and defenses.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 323-24 (1986) (remaining citation omitted)). In accordance with Fed. R. Civ. P. 56, the Court will grant summary judgment when the requesting party demonstrates that there is no genuine dispute as to a material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a), made applicable to adversary proceedings by Fed. R. Bankr. P. 7056. "[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and ... [must] demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323.

In considering a motion for summary judgment, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Wolf v. Prudential Ins. Co. of America*, 50 F.3d 793, 796 (10th Cir. 1995) (quoting *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F2d 1238, 1241 (10th Cir. 1990)). The party opposing summary judgment "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kannady v. City of Kiowa,* 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Jenkins v. Wood,* 81 F.3d 988, 990 (10th Cir. 1996)). To resist a properly supported motion for summary judgment, the opposing party may not rely on the allegations in the complaint or the denials contained in the answer, "but must set forth specific facts showing that there is a genuine issue for trial" through affidavits or other supporting evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (internal quotation marks omitted).

B.  <u>Section 544(b)</u>.

The Trustee brings the first two claims under 11 U.S.C. § 544(b)(1), which provides in pertinent part:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

§ 544(b) is most often used to recover transfers that would be voidable under state law. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 543 n.7 (1994) (describing § 544(b) as applying to "transfers voidable under state law"); *Sender v. Simon*, 84 F.3d 1299, 1305 (10th Cir. 1996) (noting that a bankruptcy trustee's powers under Section 544(b) are usually predicated upon state law).[6]

New Mexico's version of the Uniform Fraudulent Transfer Act ("UFTA"), N.M.S.A. § 56-10-1 et seq., allows creditors to avoid fraudulent transfers that occurred within four years before commencement of the action. N.M.S.A.1978 § 56-10-23. *See also In re Strom*, 2013 WL 265071, at *3 (Bankr. D.N.M.) (New Mexico's UFTA has a four-year 'look-back' period). Further, if a bankruptcy case is filed within the four-year period, the trustee is given two years from the petition date to file the avoidance action. 11 U.S.C. § 546(a)(1)(A). Debtor assigned the Note in April 2012, and filed its petition in September 2015.

C.  N.M.S.A. § 56-10-18(A)(1) (Actual Fraud).

N.M.S.A. § 56-10-18(A)(1) allows Plaintiff to avoid transfers made "with actual intent to hinder, delay or defraud any creditor of the debtor." *See also In re Vaughan Co.*, 481 B.R. 752, 758 (Bankr. D.N.M. 2012) (citing the statute for this proposition). Plaintiff has the burden of proving the elements of the claim by a preponderance of the evidence. NMSA § 56-10-18(C). In determining the actual intent, consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

---

[6] *See also In re JTS Corp.*, 617 F.3d 1102, 1111 (9th Cir. 2010) ("Under § 544(b) and § 550(a) of the Bankruptcy Code, a trustee may avoid a fraudulent transfer of property if that transfer is voidable under applicable state law."); *Baldi v. Samuel Son & Co., Ltd.*, 548 F.3d 579, 581 (7th Cir. 2008) (Section "544(b) … allows a trustee in bankruptcy to avoid transfers made by the bankrupt that would be voidable under state law if made by an unsecured creditor.").

(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

§ 56-10-18(B). These are the so-called "badges of fraud."

The Court finds that there is no genuine issue of material fact that factors 1 and 4 support the Plaintiff's position. Likewise, there is no genuine issue that factors 5, 6, and 11 either do not apply or support Defendant's position.

The issue of insolvency (factor 9) is unclear. There is undisputed evidence that Debtor was in default to Defendant and to MSRP, two major creditors. There is no evidence about how many other creditors Debtor had at the time, however, and whether it was current with those creditors. A comment to this subsection of the UFTA states:

> In determining whether a debtor is paying its debts generally as they become due, the court should look at more than the amount and due dates of the indebtedness. The court should also take into account such factors as the number of the debtor's debts, the proportion of those debts not being paid, the duration of the nonpayment, and the existence of bona fide disputes or other special circumstances alleged to constitute an explanation for the stoppage of payments. The court's determination may be affected by a consideration of the debtor's payment practices prior to the period of alleged nonpayment and the payment practices of the trade or industry in which the debtor is engaged.

Unif. Fraudulent Transfer Act § 2, cmt 2, 7A U.L.A. 38 (2006). There is not enough information in the record to determine whether the Debtor was generally paying its debts as they came due, so

the insolvency presumption does not apply. *See, e.g., Basley v. Adoni Holdings, LLC*, 373 S.W.3d 577, 584 (Tex. App. 2012) (reversing trial court on its "not generally paying debts when they came due and citing the comment).

The record is unclear about factors 2, 3, 7, 8, and 10. Overall, the Court concludes that there are genuine issues of material fact that prevent the grant of summary judgment on the Plaintiff's "actual fraud" claim.

D.  N.M.S.A. § 56-10-18(A)(2) (Constructive Fraud).

New Mexico's constructive fraudulent transfer statute provides:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> . . .
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (a) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (b) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

1.  <u>Reasonably equivalent value</u>. To determine whether Debtor received reasonably equivalent value for the Note transfer, the Court must determine if there is any genuine issue of material fact about the value of the Note and the value of the exchange consideration.

    a.  <u>Note Value</u>. The parties dispute the value of the Note on April 30, 2012. Plaintiff argues that the Note was worth its face value, i.e. $1,300,000, while Defendant argues it was worth a fraction of that, given that Flying Star filed bankruptcy and has yet to pay the Note. The Court does have two pieces of evidence about the Note's value. First, before it filed bankruptcy, Flying Star paid the Note as agreed. Second, and more importantly, Flying Star has

or soon will deposit $683,000 into the Court registry. This amount, plus any future distributions under the confirmed Flying Star plan of reorganization, will be paid to the winner of this adversary proceeding. Based on this evidence, the Court finds that there is no genuine issue of fact that, on April 30, 2012, the Note was worth at least $683,000.

      b.    <u>Value of the Exchange Consideration</u>. Defendant argues that it gave at least $1,320,200 in value for the Note, in the form of leasehold improvements to the Flying Star premises. This argument fails. It like is true that Defendant gave substantial value to the Debtor in 2009, in expectation of being paid as agreed under the ACA. However, the 2009 construction work cannot be viewed as exchange consideration for the 2012 Note assignment. This is made clear by N.M.S.A. § 56-10-17(C):

> A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous.

On the other hand, it seems logical that Debtor transferred the Note in payment of its obligations under the ACA. Satisfaction of debt is value under the UFTA. N.M.S.A. § 56-10-17(A). Other than the sentence quoted from the Plumbtech settlement agreement, however (and Defendant was not a party to the agreement), there are no accounting records, agreements, receipts, correspondence, or other types of written information in the record showing the intent of the parties in this regard. Thus, there is a fact issue about whether Debtor transferred the Note in partial or full satisfaction of its ACA obligations.

Equally unclear is how much Debtor owed Defendant under the ACA on April 30, 2012. The contract price, as noted, is $1,321,200.[7] At a minimum, Debtor should be able to deduct

---

[7] The lease amendment signed in 2012 shows a square footage of 6,595. If the trial evidence showed that the parties agreed to pay Defendant under the ACA for this square footage, then the

$490,000 from this price, since that is what Debtor agreed to pay Plumbtech. An owner cannot be required to pay as agreed on a construction contract, while at the same time being forced to pay $490,000 to a subcontractor. Similarly, Debtor may well be able to deduct the $216,000 Flying Star paid to various subcontractors, although it is unclear whether some of the goods and services Flying Star paid for were in the nature of "FF&E" rather than leasehold improvements. With respect to the other unpaid vendors and subcontractors, there is insufficient evidence that Debtor either paid them or is obligated to pay them. If neither, then Debtor likely cannot deduct what the subcontractors are owed from its debt to Defendant under the ACA.

        c.      <u>Not clear whether Debtor received reasonably equivalent value</u>. Because there are fact issues about the exchange value Debtor received for the Note, the Court cannot determine whether Debtor received reasonably equivalent value.

        2.      <u>Unreasonably Small Assets</u>. This requirement "generally calls for a court to 'examine the ability of the debtor to generate enough cash from operations and sales of assets to pay its debts and remain financial stable' after a transfer." *Dahar v. Jackson (In e Jackson)*, 459 F.3d 117, 123 (1st Cir. 2006), quoting *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.)*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992). *See also Vadnais Lumber Supply, Inc. v. Byme (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127, 137 (Bankr. D. Mass. 1989) (courts must assess the ability of the debtor to generate enough cash from operations or assets sales to pay its debts and still sustain itself).

> Unreasonably small capitalization is not the equivalent of insolvency in either the bankruptcy or equity sense. The statute uses insolvency in the bankruptcy sense, an excess of liabilities of asset values (11 U.S.C. § 101(31)), as an alternative test. The concept of equitable insolvency, inability to pay debts as they mature, is well known. *See, e.g., Revised Model Business Corp. Act.,* § 6.40 (1984). If the

---

contract price would be increased to $1,582,800. There is nothing in the current record indicating that this higher price was ever agreed to.

> intention was to refer to equitable insolvency, Congress certainly would have used that term or its definition. And yet, because fraudulent transfer law is designed to protect creditors, the financial condition intended must be related in some way to ability to pay debts. Unreasonably small capitalization therefore encompasses difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future. The sparse case law points in this direction. *E.g., In re Process–Manz Press, Inc.,* 236 F. Supp. 333, 347 (N.D. Ill. 1964); *In re Atlas Foundry Co.,* 155 F. Supp. 615, 618 (D.N.J. 1957).

Id.

The Court has insufficient evidence about Debtor's assets and liabilities after April 30, 2012, to determine whether it had an unreasonably small capital in relation to its business.

### 3. Intent to Incur Debts Beyond Ability to Pay.

> A creditor may prevail if it can show that the debtor "[i]ntended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they came due." § 38–8–105(1)(b)(II). "This test measures whether the debtor, as a going concern, would reasonably have been seen as able to pay its debts after making the questionable transfer." *In re Pajaro Dunes Rental Agency, Inc.,* 174 B.R. 557, 593 (Bankr.N.D.Cal.1994) (UFTA case).

*CB Richard Ellis, Inc. v. CLGP, LLC*, 251 P.3d 523, 531-32 (Colo. App. 2010).

> "Reasonableness" is often measured through the use of cash flow projections and other forward-looking sources of evidence available to the debtor and its creditors at the time of the transfer. If these sources were flawed and overly optimistic from the beginning, then they were unreasonable. However, if they were improvident only in the light of intervening circumstances such as fire, then the "reasonable ability" test has not been violated.

*In re Pajaro Dunes Rental Agency, Inc.,* 174 B.R. 557, 593 (Bankr., N.D. Cal. 1994).

There is insufficient evidence whether, after the Note transfer, Debtor intended to incur, or believed (or should have believed) it would incur, debts beyond its ability to pay as they came due. The current record about the Debtor's business activity between April 30, 2012, and its bankruptcy filing date of September 4, 2015, is too sparse for the Court to make any fact findings on this issue.

### E. Unjust Enrichment.

Plaintiff also asks for summary judgment on its unjust enrichment claim. Because of the lack of evidence about reasonably equivalent value, the Court will deny the motion, but preserve the claim for trial. *See, e.g., In re Operations NY, LLC,* 490 B.R. 84, 99 (Bankr. S.D.N.Y. 2013) (unjust enrichment claims overlap with fraudulent transfer claims, yet it is conceivable the plaintiff could prevail under one theory but not the other).

### III. CONCLUSION

There are genuine fact issues about the some elements of Plaintiff's claims against Defendant, so Plaintiff's summary judgment motion will be denied. The Court finds, however, pursuant to Fed. R. Bankr. Pro 7056 and Fed. R. Civ. Pro. 56(g), that the Note was worth at least $683,000 on April 30, 2012. The Court also finds that certain of the "badges of fraud" discussed above have been established, some for and some against Plaintiff's position. Finally, the Court rules that Defendant cannot use the value of the construction work done in 2009 as exchange consideration for the 2012 transfer of the Note. These findings and conclusions will be set out in a separate order.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: October 5, 2017

Copies to: counsel of record